IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CONNOR BOWE,

                Plaintiff,

v.

EAU CLAIRE AREA SCHOOL DISTRICT,
DAVID OLDENBERG, and TIM O'REILLY,

                Defendants.

OPINION & ORDER

16-cv-746-jdp

---

Plaintiff Connor Bowe is a young man with Asperger's Syndrome who attended defendant Eau Claire Area School District. He brings suit against the District and two of its principals, defendants David Oldenberg and Tim O'Reilly, alleging that they were deliberately indifferent to the harassment and bullying that he suffered as a student.

Defendants move for summary judgment. Dkt. 26. There is no dispute that Connor was severely bullied by his classmates throughout middle and high school and that defendants' efforts failed to stop the bullying. The facts of this case are deeply disturbing, and what happened to Conner at the hands of many of his classmates was shameful. But under the legal standard applicable to this case, defendants are liable only if they were deliberately indifferent to Connor's plight. Applying this standard to the undisputed facts, the court concludes that defendants' responses were not clearly unreasonable, and they are entitled to summary judgment.

## UNDISPUTED FACTS

The following facts are material and, except where noted, undisputed.

Defendant Tim O'Reilly is the principal of DeLong Middle School; defendant David Oldenberg is the principal of Memorial High School. Both schools are within defendant Eau Claire Area School District. Plaintiff Connor Bowe attended these schools as a student from 2008 until his graduation in 2015.

Connor (whom the court will refer to by first name to distinguish from his parents, Pegi and Glen Bowe) was diagnosed with Asperger's Syndrome as a young child. He was the victim of bullying in middle and high school. For example, his fellow students called Connor "gay," "queer," "fag," "pussy," "douche bag," and "shit stain," Dkt. 53, ¶¶ 30, 37, 77; put gum in his hair; threatened to kill his family; told him to "go fucking die," *id.* ¶ 82; left a bag of feces at his house; and egged his house.

During Connor's tenure as a student in the District, Connor and his parents complained of more than 30 discrete acts of bullying. Defendants investigated each complaint, which generally involved interviewing the students involved, and sometimes the investigation included referring the matter to the police or speaking to the classroom teacher. If the investigation uncovered "inappropriate action," defendants "would respond with . . . calls home or . . . corrective action plans." Dkt. 40 (O'Reilly Dep. 23:10–12). The "corrective action" ranged from "counseling" the student, to suspension, and in some cases referral for criminal charges.

One relatively modest example of bullying that Connor contends was not appropriately redressed occurred in eighth grade gym class. Connor "got very upset" when he played goalie and his fellow students "had decided they weren't going to let him out" of the goalie position. Dkt. 39 (Pegi Bowe Dep. 36:17–20). In response, Pegi and Glen met with the gym teacher, O'Reilly, and Connor's speech and language pathologist and agreed that "[i]f

[Connor] wanted to be goalie, that was fine, but he had to have a way out." *Id.* at 37:2–3. Pegi and Glen "suggested . . . that he not be goalie again." *Id.* at 37:3–4. Within "a couple of days," Connor played goalie again. *Id.* at 37:10–11.

Other examples highlight the range of defendants' responses, which often focused on counseling the students involved. When Connor got into a fight with a middle school student, O'Reilly referred the incident to the police, who investigated and determined that the fight began when Connor "said something derogatory to the other student" and then threw the student's notebook. Dkt. 54, ¶ 25. Connor acknowledges that he sometimes acted as the aggressor. *See, e.g., id.* ¶¶ 105–10 (listing Connor's acts precipitating points of "conflict," which included calling other students "faggot," "whore," "homo," "queer," and "lard ass" and threatening to "shove a hockey stick up [a student's] ass," "fuck [a student's] mother," and "beat [a student] until his face was unrecognizable"). According to Connor, his "improper behavior towards others is the result of the bullying leveled against him." Dkt. 53, ¶ 116. Connor and the other student were both suspended from school. When they returned, O'Reilly met with them to discuss respectful behavior and asked the school police liaison to "innocuously supervise Connor in the halls between classes to observe if any inappropriate or bullying behavior was being directed at Connor by other students." *Id.* ¶ 29.

To cite a couple of other examples, when Pegi and Glen reported that a high school student called Connor a "shit stain," Oldenberg investigated, determined that "Connor instigated the comment by saying inappropriate comments to the other student," talked to the other student and his parents, and explained, in a meeting with Connor and the other student, that they should not call each other names. *Id.* ¶ 74. After the meeting, "there were no more issues with that student." *Id.* When Pegi and Glen reported that another high school

student told Connor to "go fucking die," the school investigated but could not confirm that the incident occurred. *Id.* ¶ 75. A month later, Oldenberg set up a mediation between Connor, a student who made a "death threat," and their parents. *Id.* ¶ 76. (It's unclear whether this is the same student who said "go fucking die" or another student.) "There were no more substantive issues between Connor and this boy following the mediation." *Id.*

The bullying culminated in two acts that took place outside of school. In November 2013, during Connor's junior year of high school, Pegi and Glen told Oldenberg that someone left a bag of feces at their house and, weeks later, that their house had been egged. Oldenberg met Pegi and Glen at a gas station to view surveillance video of several boys buying eggs shortly before the egging took place and helped to identify one of the boys. He instructed teachers to pay attention to students' conversations to try to track down the other eggers. And he helped the school police liaison investigate and interview the eggers, several of whom admitted to leaving the bag of feces, too. In addition to out-of-school consequences (criminal charges and a civil suit), the perpetrators faced in-school consequences: Oldenberg met with each of their parents, temporarily suspended them from athletics and other extracurricular activities, and required them each to read a book on bullying, write a report, and meet with him to discuss the book "as a strategy for addressing their behavior." *Id.* ¶ 89. After this, neither Connor nor his parents reported any further bullying, although Connor contends that the bullying continued throughout his time in the District.

ANALYSIS

Defendants move for summary judgment on Connor's claims against the District under the Americans with Disabilities Act (ADA), the Rehabilitation Act (RA), and Title IX,

4

and Connor's claims against Oldenberg and O'Reilly under the Equal Protection Clause. Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* A party may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).

The parties agree that to prevail on each of his claims, Connor must show that defendants were deliberately indifferent to the bullying he suffered at the hands of his classmates—which requires Connor to show that defendants' "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).[1] "[T]his is not a mere reasonableness standard, nor does it require [schools] to remedy peer harassment." *Gabrielle*

---

[1] The court concluded in a previous order that deliberate indifference is an element of the ADA, RA, and Title IX claims. *See* Dkt. 20, at 3–6. It's less clear whether a showing of deliberate indifference is required to prove equal protection class-of-one claims. In 2012, the Seventh Circuit, sitting en banc, issued three separate opinions articulating three separate standards for class-of-one claims in *Del Marcelle v. Brown County Corp.*, 680 F.3d 887, and "[t]he elements of class-of-one claims have remained unsettled since" then. *Brunson v. Murray*, 843 F.3d 698, 706 (7th Cir. 2016). But it appears that deliberate indifference is a required element under all three standards, as earlier opinions indicate that that a showing of "intentional discrimination or deliberate indifference" is required. *D.P. ex rel. Pierce v. Sch. Dist. of Poynette*, 2004 WL 602651, at *17–18 (W.D. Wis. Mar. 16, 2004) (citing *Nabozny v. Podlesny*, 92 F.3d 446, 453–54 (7th Cir. 1996)). So the court will conduct its analysis with the understanding that whatever else may be needed to prove a class-of-one claim, a showing of deliberate indifference is required.

*M. v. Park Forest-Chicago Heights Sch. Dist. 163*, 315 F.3d 817, 824 (7th Cir. 2003). The "clearly unreasonable" standard "sets a high bar for plaintiffs" because "[s]chool administrators must 'continue to enjoy the flexibility they require' in disciplinary decisions." *Doe v. Galster*, 768 F.3d 611, 619 (7th Cir. 2014) (quoting *Davis*, 526 U.S. at 648–49); *see also Gabrielle M.*, 315 F.3d at 825 ("[C]ourts should refrain second-guessing the disciplinary decisions made by school administrators." (citing *Davis*, 526 U.S. at 649)).

Connor does not dispute that defendants investigated every instance of bullying that Connor or his parents brought to their attention. Nor does he dispute that defendants addressed confirmed acts of bullying with some sort of corrective action. Nevertheless, he contends that defendants' response to the bullying must have been clearly unreasonable because they "failed to protect Connor from harassment." Dkt. 47, at 17 (As Connor's brief puts it, "the proof here is in the pudding. The record reflects that the bullying Connor endured never ceased."). He argues that liability is assigned whenever a school does not "make a reasonable effort to remedy the harassment," citing chiefly *Vance v. Spencer County Public School District*, 231 F.3d 253 (6th Cir. 2000), and *Kelly v. Yale*, No. 01-cv-1591, 2003 WL 1563424 (D. Conn. Mar. 26, 2003). Dkt. 47, at 14.

*Vance* and *Kelly* are not binding on this court. Regardless, they support the conclusion that defendants' response was not clearly unreasonable. In *Vance*, the Sixth Circuit found that a school was clearly unreasonable when it took no action after a bully stabbed the plaintiff, and merely asked the teacher to speak to a group of boys who "attempted to rip off [the plaintiff's] clothes" while pulling her hair and removing their own pants—they never disciplined the bullies or informed law enforcement, even after the plaintiff's mother filed a Title IX complaint. 231 F.3d at 262. In *Kelly*, the plaintiff, a Yale University student, was

6

sexually assaulted and requested several accommodations pending the internal grievance procedures that ultimately resulted in the perpetrator taking a mandatory leave of absence. Yale did not respond to Kelly's requests. The District of Connecticut explicitly did "not find that Yale's refusal to bar [the perpetrator] from attending classes [pending the grievance procedures] was clearly unreasonable." 2003 WL 1563424, at *5. But it denied summary judgment because it "was substantially less clear . . . whether Yale's particular course of action—in which minimal efforts were made to protect Kelly from further harassment prior to the completion of the grievance procedures[—]violated Title IX." *Id.* Defendants here, on the other hand, always responded in some form to the Bowes' complaints and requests, often involved law enforcement, and sometimes disciplined students.

Connor argues that in some instances, defendants "took only nominal action" in response to reported bullying.[2] Dkt. 47, at 17. Nominal action could be clearly unreasonable in some circumstances, as in *Davis*, when the school merely "threatened" a male student who repeatedly sexually harassed the plaintiff by speaking to her in vulgar language, rubbing against her in a sexually suggestive behavior, and attempting to touch her breasts and genital area. 526 U.S. at 635. But as discussed above, that's not what happened here.

Specifically, Connor complains that the response to the goalie incident was "nominal," but allowing Connor to play goalie soon after he became upset while playing that position

---

[2] Defendants argue that Connor has not adduced admissible evidence of many instances of bullying. In some cases, defendants are right. For example, Pegi's deposition testimony and emails stating that Connor told her about a particular act of bullying are inadmissible hearsay. So the goalie incident, for example, is proffered on inadmissible hearsay. Dkt. 53, ¶ 131. On the other hand, Connor's deposition testimony about acts of bullying that he experienced is not. But the precise nature of these acts is immaterial. Defendants agree that Connor and his parents complained about the bullying. The issue is whether defendants' responses were clearly unreasonable. They were not.

was not clearly unreasonable. Connor's parents agreed that he should be allowed to play goalie again if he wanted to, and there's no indication that Connor did not want to play goalie again or that Connor was harassed or mistreated in any way as a result of playing goalie a second time. Connor also complains that the school police liaison "tailed" him after the fight and on other occasions but didn't tail "any of Connor's bullies." Dkt. 47, at 18. Again, this is not clearly unreasonable: there were multiple bullies but only one victim, and so the school police liaison kept an eye on the victim.

Connor complains that several disciplinary measures were insufficient. For example, the removal of one bully from the National Honor Society was only temporary, the bullies who were barred from trying out for the hockey team "were insufficiently talented to make the team in the first place," and defendants relied too heavily on "counseling" other students "on how to act appropriately." Dkt. 47, at 18–19. Defendants certainly favored counseling over other, more severe types of discipline, but it appears to have worked, at least in some instances, *see, e.g.*, Dkt. 54, ¶ 74 (explaining that after Oldenberg's meeting with the student who called Connor "shit stain," "there were no more issues with that student"), and so defendants were not clearly unreasonable for continuing to use it. It appears that Connor was bullied by many different students, some of whom engaged in a few acts of bullying, although it's difficult to tell because the parties have often redacted the other students' names. Continued counseling of a handful of students after numerous instances of bullying might be clearly unreasonable, but the evidence does not indicate that that's what happened here. To call these kinds of measures clearly unreasonable would be to engage in the kind of second-guessing of school administrators' disciplinary decisions that the Supreme Court and the Seventh Circuit have instructed district courts to avoid.

Connor also complains that defendants did not take disciplinary action in response to the bag-of-feces incident. But he admits that defendants had a "limited" ability to discipline students for bullying done out of school. Dkt. 54, ¶ 90. In fact, the Supreme Court noted in *Davis* that a school may only be liable for harassment that "take[s] place in a context subject to the school district's control," such as bullying that "occurs during school hours and on school grounds." 526 U.S. at 645–46. The fact that Oldenberg went above and beyond by disciplining the eggers—several of whom also took part in the bag-of-feces incident—for one out-of-school act does not mean that he was clearly unreasonable for failing to discipline them separately for another out-of-school act, especially when both out-of-school acts were referred to the police and resulted in criminal charges.

The students who bullied Connor should be ashamed, and the District cannot be particularly proud of its response to the problem. But the question before the court is not whether the defendants could have done more to prevent Connor's suffering, but whether they were deliberately indifferent to it. Defendants did not ignore any of Connor's complaints, and no reasonable juror could find that defendants' response to the bullying was clearly unreasonable. The court will enter summary judgment in defendants' favor.

ORDER

IT IS ORDERED that:

1. Defendants Eau Claire Area School District, David Oldenberg, and Tim O'Reilly's motion for summary judgment, Dkt. 26, is GRANTED.

2. The clerk of courts is directed to enter judgment in defendants' favor and close this case.

Entered February 7, 2018

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge